UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF SOUTH DAKOTA; JAYSEN HILL,<br><br>Plaintiffs,<br><br>v.<br><br>MONAE JOHNSON, Secretary of State of the State of South Dakota, in official capacity; SCOTT D. MCGREGOR, Member of the State Board of Elections of South Dakota, in official capacity; LINDLEY HOWARD, Member of the State Board of Elections of South Dakota, in official capacity; KENT ALBERTY, Member of the State Board of Elections of South Dakota, in official capacity; JAMALIA FRANZEN, Member of the State Board of Elections of South Dakota, in official capacity; KRISTIN MATSUDA, Member of the State Board of Elections of South Dakota, in official capacity; AUSTIN HOFFMAN, Member of the State Board of Elections of South Dakota, in official capacity,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | 4:26-CV-04162-ECS<br><br>**RESISTANCE TO MOTION FOR PRELIMINARY INJUNCTION** |

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

Earlier this year, the South Dakota legislature enacted Senate Bill 175, which requires voters to provide documentary proof of citizenship to register to vote in state (but not federal) elections. SDCL § 12-4-1.3(2); *id.* § 12-4-1.4. The legislation was signed into law in March. The League of Women Voters of South Dakota (the "*League*") and Jaysen Hill have now sued, seeking preliminary and permanent injunctive relief against the way S.B. 175 is administered. This lawsuit does not challenge the proof-of-citizenship requirement as such. (Doc. 1, ¶ 2.) Instead, the plaintiffs' objections fall into two categories: First, they challenge S.B. 175's

requirement that certain documents be produced in *physical* form, rather than as photocopies. Second, they assert that some auditors have not provided adequate notice of the reason voters are assigned "federal-only" voting status, in violation of the Due Process Clause. (*Id.* ¶¶ 3, 6.) Only the latter claim is the subject of the request for preliminary relief, as the plaintiffs are content to leave the physical-identification issue for another day. (Doc. 11, at 14-19.) The motion should be denied. Neither the League nor Hill has standing to challenge the adequacy of auditor notices, and, in any event, the proposed injunctive relief sweeps far beyond this Court's equitable power.

**BACKGROUND**

In South Dakota, as in most states, a prospective voter must register before casting a ballot. SDCL § 12-4-1; *see* S.D. Const. art. VII, § 2. State law establishes two classes of registered voters: (i) those who satisfy the statutory criteria necessary to vote in state and local elections and (ii) those who do not but who may still participate in federal elections held in the state. SDCL § 12-4-1.3. Before March 2026, the only added criterion for participating in state elections was that the individual registering to vote (i) list a personal address—rather than one affiliated with a mail-receiving or mail-forwarding service or P.O. box—when registering or (ii) otherwise describe "the location of [her] habitation." *Id.* § 12-4-1.3 (2025). If the completed registration form satisfied either option (plus the general criteria for registration), the auditor would designate the registrant as a full-ballot voter, free to participate in federal and state elections. *Id.* If not, the auditor would designate the registrant as a federal-only voter. *Id.*

In early 2026, the legislature, concerned that noncitizens might be able to register to vote in state and local elections, introduced a second criterion. Senate Bill 175 proposed that a person registering to vote be required to provide documentary proof of citizenship in order to be a full-ballot voter. Specifically, an individual could present (i) a South Dakota driver's license or

nondriver identification card issued after July 1, 2025 (the date South Dakota added a citizenship marker to the back of these cards); (ii) a driver's license or nondriver identification card from another state that indicates sufficient proof of citizenship; or (iii) a tribal identification card. SDCL § 12-4-1.4(1), (2), (3) (2026). Alternatively, the individual could present (iv) a "legible photocopy" of several other identifying documents, such as a birth certificate, passport, or certificate of naturalization. *Id.* § 12-4-1.4(4); *see* 42 C.F.R. § 436.407 (incorporated thereby). The proposed change was not retroactive: S.B. 175 would not apply to registered voters who updated their existing voting information, and would instead reach only first-time registrants and once-registered voters who had been removed from the voter rolls. *See* SDCL § 12-4-1.3(2). The legislature voted 92-9 to approve the legislation, and, on March 30, the governor signed S.B. 175 into law. Because the text of the bill contained an emergency clause, it went into effect immediately. *See* S.B. 175, § 7, 101st Leg. Sess. (S.D. 2026); *see* S.D. Const. art. III, § 22.

In South Dakota, registering voters is the province of county auditors. It is the auditor who is tasked with accepting the voter-registration application, SDCL § 12-4-2; *id.* §12-4-3.2, reviewing the application "for eligibility and completeness," *id.* § 12-4-5.3; deciding whether the applicant meets the criteria to register as a federal-only or full-ballot voter, *id.* § 12-4-1.3(2); formally registering the applicant, *id.* § 12-4-2; *id.* § 12-4-5; and notifying the applicant if the auditor concludes that the applicant is not eligible to register. *Id.* § 12-4-5.3. Subject to the general dictates of the state legislature, county auditors thus have near-complete control over the voter-registration process from beginning to end. By contrast, the roles of the Board of Elections (the "*Board*") and the Secretary of State (the "*Secretary*") are far more limited. As applicable here, the Board is statutorily tasked with developing the format and contents of certain forms and

notices, including the "acknowledgement notice" that is sent out if an applicant's registration is not accepted. *See* SDCL § 12-4-5.3; *id.* § 12-1-9(1), (3); *see also* S.D. Admin. R. 5:02:03:14.

The Secretary is the *ex officio* chairperson of the Board. SDCL § 12-1-5. Outside of that position, however, her independent role in the registration process is quite narrow. The Secretary does not have statutory authority to promulgate rules related to voter registration, except as concerns narrow issues of retention and transmission of voter-registration records. *See id.* § 12-4-39. As a public service, the Secretary's office does publish informal guidance concerning election and voter-registration laws. In the wake of S.B. 175, for example, the Secretary distributed a memo to all auditors explaining "the circumstances under which an individual may be designated a federal-only voter" and outlining the documents that are acceptable to prove citizenship. (Doc. 12-2, at 2-4.) Similar guidance is publicly available on her website. *See Division of Elections*, *S.D. Secretary of State* (Sept. 1, 2026), https://sdsos.gov/elections-voting/voting/register-to-vote/default.aspx (outlining the impact of S.B. 175). The office has also published a checklist to be used by auditors for in-person registrations. (Doc. 12-3, at 2-3.) Ultimately, however, no one in local government is bound by the statements in these materials.

In addition to these efforts, the Secretary's office has fielded inquiries from, and provided guidance to, auditors around the state. Sometimes, this guidance has taken the form of responses to inquiries from individual auditors, (*see* Dec. Ex. 1), and, sometimes, it has taken the form of guidance sent, via an email listserv, to all auditors at once. (*See* Dec. Ex. 2.) To take an illustrative example, in early April, an auditor contacted the Secretary seeking advice about what to do when registration packets are submitted by mail and do not include S.B. 175-compliant proof of citizenship. (Dec. Ex. 1, at 2.) In response, the Secretary's office advised the auditor to (i) designate the applicant as a federal-only voter, per SDCL § 12-4-1.3, and (ii) "[t]hen reach

out, via a letter, to the voter explaining why they are federal and what they have to do to become a full ballot voter." (*Id.* at 1.) Because the Secretary lacks formal rulemaking authority, and S.B. 175 does not definitively answer every question, the best the Secretary can do is give advice on "what seems logical to do." (*See id.*) And, when it comes down to it, auditors are not bound by her recommendations and may choose to proceed as they think consistent with the law.

On August 24, 2026—roughly five months after S.B. 175 went into effect and just over two months before the upcoming November 3, 2026, election—the League brought this lawsuit. The League describes itself as "a membership-run, nonpartisan, nonprofit organization that seeks to encourage informed and active participation in government at all levels." (Doc. 1, ¶ 16.) The League has six chapters spread across South Dakota and claims roughly 150 members statewide. (*Id.* ¶¶ 17-18.) According to the League, the "primary way" it interacts with prospective voters is through registration drives. (*Id.* ¶ 20.) At these drives, the League, its members, and volunteers "guide applicants through the voter registration process, answer questions, and ensure that applications are completed correctly." (*Id.*) The League "then ensure[s] that the applications are submitted correctly to county auditors in accordance with South Dakota law." (*Id.*) The League alleges that S.B. 175—and the physical-identification requirement, in particular—has interfered with its efforts to conduct these registration drives. (*Id.* ¶¶ 22-25; *see* Doc. 12-4, ¶¶ 22-33.)

Joining the League in its lawsuit is Jaysen Hill, an individual resident of Sioux Falls and Minnehaha County. (Doc. 1, ¶ 32.) According to Hill, he registered to vote in May 2026, by sending in a voter-registration packet and a photocopy of a nondriver identification card that had been issued on January 23, 2025. (*Id.* ¶¶ 32-33.) Because Hill's submission did not comply with S.B. 175's proof requirement, he was registered as a federal-only voter. Hill now recognizes that he "did not properly provide documentation to prove [his] U.S. citizenship." (Doc. 12-6, ¶¶ 10-

11.) However, he asserts that he did not receive any notice that he was assigned federal-only status on this basis, (*id.* ¶¶ 12-13), and that he has not been given instructions on how to fix the defect with his application. (*Id.* ¶ 14.) Hill acknowledges that, as a consequence of a disability, his memory is sometimes "impair[ed]," but he maintains that this sequence is correct "to the best of [his] recollection." (*Id.* ¶ 3.) As it turns out, though, Hill is mistaken. On May 4—the day Hill registered to vote—the Minnehaha County Auditor sent him a letter explaining the impact of S.B. 175 and outlining the "acceptable documentary proof" that could be submitted to prove U.S. citizenship. (Dec. Ex. 4; *see* Dec. Ex. 3.) The letter also instructed Hill to contact the auditor's office if he "ha[d] any questions," and provided a phone number at which to do so. (Dec. Ex. 4.)

The League and Hill "do[] not challenge South Dakota's decision to request [documentary proof of citizenship] from registrants in state and local elections." (Doc. 1, ¶ 2.) Nor do they object to the general categories of documentation that can be used to satisfy the statute. (*See* Doc. 12-5, at 14.) Instead, the plaintiffs take issue with two features of S.B. 175, reflected either in its text or in the way it has been implemented. ***First***, the plaintiffs challenge S.B. 175's requirement that some documents be produced in physical form, rather than as photocopies. (Doc. 1, ¶¶ 6, 124-130.) According to the plaintiffs, this requirement violates the Materiality Provision of the Civil Rights Act, (*id.*), which prohibits denying the right to vote "based on 'an error or omission' in a registration document if such error or omission is 'not material in determining whether such individual is qualified under [s]tate law to vote.'" *Get Loud Ark. v. Jester*, 171 F.4th 1058, 1065 (8th Cir. 2026) (quoting 52 U.S.C. § 10101(a)(2)(B)). ***Second***, the plaintiffs assert that some auditors have failed to provide registrants with adequate notice of the reason they were assigned "federal-only" voting status or with instructions on how

to cure the error. (Doc. 1, ¶¶ 3, 109-122.) They assert that this notice failure violates the Due Process Clause. (*Id.*) Only the plaintiffs' due-process claim is at issue in the current motion.

## LEGAL STANDARD

This matter is before the Court on a motion for preliminary injunction. In evaluating a request for preliminary injunctive relief, a court considers (i) the likelihood that the movant will succeed on the merits, (ii) the threat of irreparable harm, (iii) "the state of the balance between this harm and the injury that granting the injunction will inflict on the other parties litigant," and (iv) the public interest. *Iowa Migrants Movement for Justice v. Bird*, 157 F.4th 904, 917-18 (8th Cir. 2025) (internal quotation omitted). Of these factors, the "most important" is whether the movant has "clearly show[n]" that it is "likely to prevail on the merits." *Id.*; *Missouri v. Trump*, 128 F.4th 979, 991 (8th Cir. 2025) (internal quotation omitted); *see Rodgers v. Bryant*, 942 F.3d 451, 455-56 (8th Cir. 2019). The Eighth Circuit treats likelihood of success as a threshold requirement for preliminary relief, and the failure to meet it is "fatal" to the movant's case. *Eggers v. Evnen*, 48 F.4th 561, 566-67 (8th Cir. 2022). If the movant cannot show it is likely to prevail, the remaining factors "cannot tip the balance of harms in [its] favor." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 737 n.11 (8th Cir. 2008). Here, because the plaintiffs cannot "clearly show" they are likely to prevail on their due-process challenge, the Secretary and the Board limit their analysis to that factor and do not address the other three.

## ARGUMENT

The plaintiffs' challenge is unlikely to succeed because neither the League nor Hill has standing to challenge the adequacy of the notices sent to prospective voters who did not comply with S.B. 175's proof-of-citizenship requirements. To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury

likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "At the preliminary injunction stage, . . . the plaintiff must make a clear showing that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (internal quotation omitted). Ordinarily, at the outset of the case, that showing is based on the allegations in the complaint. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Where the parties have introduced evidence, however, the plaintiff can no longer "rest on mere allegations, but must instead point to factual evidence in support of [its] standing." *Female Athletes United v. Ellison*, 172 F.4th 1019, 1026 (8th Cir. 2026) (internal quotation omitted).

When assessing whether the League and Hill have carried this burden, the scope of the motion matters, as does the relief sought. "[S]tanding is not dispensed in gross," which means the "plaintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (internal quotation omitted). The preliminary-injunction motion is limited to Count I in the complaint. (*See* Doc. 10; Doc. 11, at 14-19.) For present purposes, then, the Court need not concern itself with whether Hill or the League has standing to challenge the physical-identification requirement. The only question is whether either has standing to challenge the alleged lack of notice and opportunity to cure.

To remedy that alleged due-process violation, the plaintiffs have requested injunctive and declaratory relief against the Secretary and the members of the Board. At this preliminary stage, the plaintiffs have asked the Court (i) to enjoin both the Secretary and the Board "from registering individuals as federal-only voters on the basis of a lack of documentary proof of citizenship" without affording them adequate notice and an opportunity to cure and (ii) to compel the Secretary, but not the Board, "to issue guidance to South Dakota's county auditors instructing

them to provide all voters with adequate and meaningful notice and an opportunity to cure." (Doc. 10, at 1-2.) This request mirrors the ultimate relief sought in the plaintiffs' complaint. (*See* Doc. 1, at 28.) For the plaintiffs to be entitled to preliminary relief, there must be at least one of them who has standing to demand each of these injunctions. *See Murthy*, 603 U.S. at 61.

**I. The League lacks standing to seek prospective injunctive relief against the Secretary and the Board, as it has not been injured by any supposed notice defect.**

Neither of the plaintiffs has standing to challenge the adequacy of the notices sent by county auditors or the opportunity to cure a defective registration. Start with the League. There are two ways an organization can assert standing. First, an association may possess "standing in its own right," to vindicate its own injuries. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Second, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Id.* These two theories of standing are often dubbed organizational standing and associational standing, respectively. To assert associational standing, the League must identify at least one member who would have standing in his or her own right. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013). In this case, the League has not been injured by any defective notice, and it has not identified any individual member who has standing.

**a. The League lacks organizational standing, as it has not suffered a constitutionally cognizable injury in its own right.**

The League does not have standing in its own right, as it has not been injured by the alleged lack of adequate notice afforded to individual federal-only voters. Quite obviously, the League has not suffered an injury in the most conventional sense, as it is not a voter eligible to participate in South Dakota's elections. Instead, the League posits three alternative injuries: First, the League suggests that the alleged lack of notice and opportunity to cure "jeopardizes the

League's relationship with prospective voters and the public," on the theory that voters will blame the League if those voters show up at the polls and find out they are not permitted to vote in state elections. (Doc. 1, ¶ 30.) Second, the League asserts that the ambiguities in the law make it harder "to train its volunteers, answer voters' questions, or give voters guidance," as the League cannot supply answers that are as definite as it would prefer. (*Id.* ¶ 28.) And, third, the League says that, without a straightforward notice-and-cure process, it will have to expend more time and resources identifying voters that have been registered as federal-only. (*Id.* ¶ 29.) None of these convoluted theories of harm amounts to an injury for purposes of Article III standing.

To start, the League's "blame" theory rests on a "speculative chain of possibilities" that is insufficient to confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). The League assumes (i) that an unspecified group of voters has sought advice from the League concerning voter registration, (ii) that these voters are eligible to vote in state elections and thus could register for full voting status, *see* SDCL § 12-4-1, (iii) that, notwithstanding the League's advice on how to register, some portion of these voters will commit an error on their registration forms that results in them being deemed "federal-only" voters, (iv) that the voters will not discover the error (through notice from an auditor or otherwise) before the election, (v) that they will show up at the polls on election day and discover they are federal-only voters, (vi) that they will blame the League—and not themselves, state or local officials, or someone else—for their inability to participate in state elections, and (vii) that this blame will manifest in some material harm to the relationship between the League and those voters. That "alleged injury is too speculative to invoke the jurisdiction of an Art[icle] III court." *See, e.g.*, *Whitemore v. Arkansas*, 495 U.S. 149, 157 (1990) (rejecting standing argument based on a chain of hypotheticals).

Next, the League insists that notice and opportunity to cure are necessary because, without them, it is difficult for the League "to train its volunteers, answer voters' questions, or give voters guidance" as long as key questions about the process "remain unanswered." (Doc. 1, ¶ 28.) At bottom, the injury claimed under this theory is simply that, without added guidance, South Dakota's post-S.B. 175 election law does not address some questions the League feels should be addressed. But to have standing to sue, the League must do more than identify "a generalized grievance shared in substantially equal measure by all or a large class of citizens." *Warth*, 422 U.S. at 499 (internal quotation omitted). An alleged lack of clarity in the law is a grievance shared by all citizens of South Dakota, which is better left to the political process to resolve. Holding otherwise would eliminate the boundaries of standing doctrine: It would mean that policy advocates have automatic standing whenever the legislature decides not to address an issue the advocates want to see addressed. And it would mean that all manner of professionals—lawyers, accountants, and business advisors—have standing whenever they spot an ambiguity in the law that creates some degree of uncertainty for their clients. This sweeping approach to standing is inconsistent with existing doctrine and the federal courts' limited jurisdiction.

Finally, the League asserts that it has standing because it will now have to divert resources to identifying and contacting voters who might have otherwise sought out the League once notified that they were given federal-only voting status. (Doc. 1, ¶ 29.) This alleged injury is also speculative. For example, there is no way of knowing whether, if not for the alleged notice deficiency, a voter would have contacted the League—rather than, say, reaching out to his or her local auditor. Speculation aside, an organization cannot "establish standing by 'divert[ing] its resources in response to a defendant's actions.'" *Holmes v. Bax*, No. 25-1987, 2026 WL 2421803, at *4-5 (8th Cir. Aug. 19, 2026) (quoting *Hippocratic Med.*, 602 U.S. at 395). As

reflected in its president's affidavit, the primary cause of the League's resource diversion was "the time setting up and implementing trainings and procedures to deal with S.B. 175"—*i.e.*, the costs that would attend *any* change in the law. (Doc. 12-4, ¶¶ 66-68.) If expenditures of this sort were enough to support standing, "all the organizations in [South Dakota] would have standing to challenge almost every [state] policy that they dislike." *Holmes*, 2026 WL 2421803, at *4-5.

In that respect, this case is unlike *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In *Havens Realty*, the Supreme Court held that HOME, a housing-counseling service, had standing to challenge the actions of a housing provider that gave HOME false information about whether apartments were available. *Id.* at 368, 378. The provider had "perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers," "with a consequent drain on resources." *Id.* at 369, 379. Both the Eighth Circuit and the Supreme Court have cautioned against overreading this limited holding. The case does not provide that simply diverting resources is enough for standing. *Hippocratic Med.*, 602 U.S. at 395. Instead, to trigger standing, the challenged conduct must "directly . . . interfere" with the plaintiff's "core business activities." *Id.*; *Holmes*, 2026 WL 2421803, at *4; *see Get Loud*, 171 F.4th at 1064 (finding standing where the state "forbade" an organization from using a tool core to its business model). Here, the purported notice failure does not directly regulate or impede the League's business; at most, the impact is conjectural and indirect. To the extent that the League has diverted resources in response, that diversion does not afford it standing. "*Havens* was an unusual case," and the Supreme Court has instructed courts not to "extend [its] holding beyond its context." *Hippocratic Med.*, 602 U.S. at 396. This case provides no occasion to do so.

A final point on organizational standing: The League also alleges at various points that the passage of S.B. 175 has interfered with its voter-registration efforts. And it is true that, in the

Eighth Circuit, impairing an organization's "ability to provide voter registration services" may sometimes satisfy the injury requirement for Article III standing. *Get Loud*, 171 F.4th at 1067. But, here, the claimed injury has nothing to do with the adequacy of the post-registration notice or opportunities to cure. Even in the League's telling, the interference with its voter-registration drives has been caused by the physical-identification requirement—which is not the subject of this motion—and not by the quality of post-registration notice. (*See* Doc. 12-4, ¶¶ 22-33.) *Cf. League of Women Voters v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016) (finding an injury caused by a proof-of-citizenship requirement). That makes sense. At the risk of stating the obvious, the League's efforts to register voters must take place before those voters register. (Otherwise, what would be the point?) But the alleged notice-and-cure issues do not arise until *after* the voter has registered. The League does not explain how a problem that arises only for voters who have already registered could possibly interfere with drives designed to recruit unregistered voters.

None of the League's generalized or speculative theories of harm satisfy the jurisdictional requirements of Article III. The League has failed to adduce any facts demonstrating that it, as an organization, has suffered a concrete and particularized injury that gives it standing.

**b. The League cannot assert standing on behalf of its members, as it has not identified a member who has standing to sue in his or her own right.**

Without a direct injury, the League may instead attempt to claim associational standing. In gauging associational standing (and organizational standing, for that matter), the Court should take care not to confuse the alleged injuries of the League and its members with the failure of *nonmembers* to register successfully as full-ballot voters. For example, while the League alleges that "the chances of the applicant becoming a full-ballot voter without a formal process for them to amend their application significantly declines," (Doc. 12-4, ¶ 40), that harm runs to the voter, not to the League. (*See, e.g.*, *id.* ¶¶ 49-52.) No doubt, the League would prefer to see as many

voters registered in South Dakota as possible. But "an organization may not establish standing simply based on the intensity of [its] interest" in a particular policy outcome, "no matter how longstanding the interest and no matter how qualified the organization." *Hippocratic Med.*, 602 U.S. at 394 (internal quotation omitted). Instead, to establish associational standing, the League must show that at least one of *its members* has standing—*i.e.*, that the member was injured, that this injury stems from the alleged absence of a notice-and-cure regime, and that the injury is redressable in this litigation. *Hunt*, 432 U.S. at 343; *Iowa League of Cities*, 711 F.3d at 869.

The League has not carried that burden. Its failure to do so is fatal. *See Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 339 F.3d 1001, 1008 (8th Cir. 2003). The League's complaint and affidavits include a single anecdote about a member who was "unlawfully required by a county auditor's office to provide [proof of citizenship] while updating her voter registration in person." (Doc. 1, ¶ 31; Doc. 12-4, ¶ 61.) But, unlawful or not, these allegations have no relationship to the adequacy of post-registration notice or the right to appeal a federal-only designation. The complaint does not allege that this member was deprived of notice or that she needed a registration do-over. Indeed, the complaint never goes so far as to suggest that this member was denied full voting status—presumably because she either convinced the auditor that the law did not apply to her or was able to produce the requested documentation. While the League "expects" that future members will experience "similar" issues when registering, (Doc. 1, ¶ 31), it cites nothing to support that belief. (*See* Doc. 12-4, ¶ 59 (adverting to the possibility that new people who move to the state will become League members but never explaining how the lack of post-registration notice would cause them an Article III injury).) "[S]ubjective belief is not enough to confer standing." *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009).

Because the League has not identified a member with standing to challenge the alleged lack of proper notice, it cannot assert associational standing on its members' behalf.[1]

* * * *

In short, whether analyzed in terms of organizational or associational standing, the League has not suffered an Article III injury that stems from the current notice regime. It is not enough for the League to point to an "abstract social interest in maximizing voter turnout" or to hypothesize nonmember voters who may have unsuccessfully registered. *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014); *see Citizens Proj. v. City of Colorado Springs*, No. 22-01365, 2024 WL 3345229, at *7 (D. Colo. July 9, 2024) ("The fact that [the p]laintiffs are dedicated to serving voters is not enough to confer organizational standing."). Absent a concrete, particularized injury traceable to a failure of notice or inability to cure, the League has not cleared "the irreducible constitutional minimum" for federal jurisdiction. *Lujan*, 504 U.S. at 561.

## II. Hill lacks standing to seek prospective injunctive relief against the Secretary and the Board, as he has not suffered a legally cognizable injury, and any future injury he stands to suffer is self-inflicted, rather than caused by a supposed defective notice.

That leaves the individual plaintiff, Jaysen Hill. Hill admits that he "did not properly provide documentation to prove [his] U.S. citizenship," (Doc. 12-6, ¶¶ 10-11), "because he submitted a photocopy of a state identification card that is not among the kinds of identification documents that can serve as sufficient [documentation] under the new law." (Doc. 1, ¶ 38.) Hill says he submitted a nondriver identification card issued on January 23, 2025. (*Id.* ¶ 33.) A pre-July 1, 2025, nondriver identification card cannot serve as proof of citizenship, regardless of

[1] It will not suffice to identify a different member who has since suffered an injury (supposing that such a person exists). Standing is assessed as of the outset of the suit, *Lujan*, 504 U.S. at 570 n.5, and a litigant has an obligation to "establish its standing . . . at the first appropriate point in the review proceeding." *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 831 F.3d 961, 968 (8th Cir. 2016) (internal quotation omitted) (alteration in the original).

whether that card is presented in physical form or submitted as a photocopy. *See* SDCL § 12-4-1.4(1); 42 C.F.R. § 436.407(a)(4). Hill does not challenge that rule. Instead, his complaint is procedural: He asserts that he did not receive notice that his registration to vote in state and local elections was rejected on this basis, (Doc. 12-6, ¶¶ 12-13), and that he was not given instructions on how to fix the defect with his application. (*Id.* ¶ 14.) In other words, he argues that although he did not follow the law, he should have been sent a notice instructing him how to comply.

But Hill was sent such a notice. On May 4, 2026—the day Hill registered—the Minnehaha County Auditor's office sent him a form letter explaining S.B. 175, the bifurcated voter-registration system, and the "acceptable documentary proof" that could be submitted to prove U.S. citizenship. (Dec. Ex. 4.) The letter also instructed Hill to contact the auditor's office if he "ha[d] any questions," and provided a phone number at which he could do so. (*Id.*) Hill does not remember receiving this letter—which is unsurprising since, by his own admission, his medical issues "impair [his] memory at times." (Doc. 12-6, ¶¶ 3, 9, 13.) However, internal auditor records accessible to the Secretary confirm that the letter was sent. (Dec. Ex. 3, at 1.) Had Hill reviewed the letter sent to him, he would have been on notice that he did not comply with the statute. (Dec. Ex. 4.) He would have also been on notice of the information needed to correct his error, and, if he did not understand, of how to go about contacting the county auditor for help. (*Id.*) He is in no position to claim that he has been injured by a lack of adequate notice, and he cannot assert the rights of other voters who, unlike him, did not receive such a notice.

Even if Hill had not been sent this corrective notice, he would still lack standing. Hill has not sought damages, and any prospective injury he stands to suffer is not fairly traceable to the supposed notice deficiency. *See Lujan*, 504 U.S. at 560-61. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—

is insufficient to create Article III standing." *School of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1000 (8th Cir. 2022) (internal quotation omitted). Presumably recognizing as much, Hill frames his injury as the loss of the right to vote. (*See* Doc. 11, at 15, 18.) But any injury to that right can be easily avoided. Even if, contrary to the facts, the auditor did not notify Hill of the error in his registration packet, Hill now knows what the error was. In an affidavit submitted alongside the motion for preliminary injunction, Hill recounted what he has "since learned" about "South Dakota's new documentary proof of citizenship law" and acknowledged that he "understand[s] now" what he did wrong. (*See* Doc. 12-6, ¶¶ 10-11.) Meanwhile, he does not challenge the law with which he failed to comply, only the notice and explanation of his noncompliance.[2]

There is no connective tissue between the adequacy of the notice and Hill's claimed constitutional loss. Hill, by his own admission, knows that he failed to comply with S.B. 175. He still has ample time to correct his noncompliance by providing appropriate papers to the county auditor. *See* SDCL § 12-4-5. Should he fail to do so before the deadline, that failure rests squarely on his shoulders. A self-inflicted harm "does not satisfy the traceability prong" of standing. *ABF Freight Sys., Inc. v. Int'l Brotherhood of Teamsters*, 645 F.3d 954, 961 (8th Cir. 2011). While "[n]ot every infirmity in the causal chain deprives a plaintiff of standing," the causal connection between injury and challenged conduct falls apart where the plaintiff makes an unreasonable decision that "bring[s] about a harm that he knew to be avoidable." *Id.* (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000)); *St. Pierre*, 208 F.3d at 403; *see* 13A Wright & Miller § 3531.5 n.73 (collecting cases). This case fits the bill. If Hill would like to "have [his]

[2] For that reason, Hill cannot rely on cases holding that a plaintiff still has standing to challenge an avoidable injury if the only way to avoid the injury is for the plaintiff to submit himself to the conduct that he challenges as unlawful. *See FEC v. Cruz*, 596 U.S. 289, 298 (2022). S.B. 175's proof-of-citizenship requirement stands unchallenged, and the Court must assume that it is lawful for purposes of assessing whether there is standing to challenge other features of the law.

voice heard" this coming November, (Doc. 12-6, ¶ 17), all he needs to do is submit a corrected application to the Minnehaha County Auditor. He cannot blame lack of notice for his failure to fix this problem; he has since obtained the information that he needs to register to vote.

The plaintiffs' motion is limited to remedying potential future harms caused by a supposed notice deficiency—not harms that occurred in the past or harms that might be brought about by the physical-identification requirement or any other aspect of S.B. 175. *See Frost v. City of Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019) ("An injunction is inherently prospective and cannot redress past injuries."). Hill stands to suffer no such harm. The record shows that he was already sent the notice he demands, and, even if that was not the case, he could avoid any negative impact on his voting rights by using what he knows to correct his defective application.

## III. Neither the League nor Hill has standing to sue, as any alleged harm is not redressable via the requested injunctions against the Secretary and the Board.

Even assuming away the issues with injury and causation, there is a still-more-fundamental reason that neither the League nor Hill has standing to seek prospective injunctive relief: The defendants who they sued cannot provide the relief they request. Recall that the plaintiffs have requested two forms of injunctive relief: (i) an injunction that prevents both the Secretary and the Board "from registering individuals as federal-only voters on the basis of a lack of documentary proof of citizenship" without affording them adequate notice and an opportunity to cure and (ii) an injunction that compels the Secretary, but not the Board, "to issue guidance to South Dakota's county auditors instructing them to provide all voters with adequate and meaningful notice and an opportunity to cure." (Doc. 10, at 1-2.) For the plaintiffs to have standing, it must be "'likely' and not merely 'speculative' that their injury would be redressed if they were granted the remedy they seek." *Wieland v. U.S. Dep't of Health & Human Servs.*, 793 F.3d 949, 956 (8th Cir. 2015) (quoting *Lujan*, 504 U.S. at 561). Moreover, that injury must be

redressed by "the effect of the court's judgment *on the defendant[s]*." *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) (internal quotation omitted).

Here, neither requested injunction would redress the plaintiffs' claimed injury. The plaintiffs' first request is to enjoin the Secretary and the Board "from registering individuals as federal-only voters on the basis of a lack of documentary proof of citizenship" without notice and an opportunity to cure. (Doc. 10, at 1.) But neither the Secretary nor the Board "register[s]" voters. In South Dakota, that responsibility is instead left to auditors at the county level. *See, e.g.*, SDCL § 12-4-2 ("Voter registration must be conducted by each county auditor and municipal finance officer."); *id.* § 12-4-1.3(2) (tasking the auditor with "designat[ing]" individuals as federal-only voters); *id.* § 12-4-5.3 (giving the auditor the power to "review [a registration] application for eligibility and completeness" and to notify the applicant if his or her application is not accepted). The auditors are not a party to these proceedings and therefore cannot be enjoined. *Cf. Hutchinson*, 803 F.3d at 958 ("A district court has no authority to enjoin the statute; an injunction would run only against the defendants in the case."). And an injunction against either the Secretary or the Board would be a nullity, as neither of them has the power to register voters or to change the registration status of those who have already registered.

The plaintiffs' second request suffers the same fate. This time, the plaintiffs' requested relief runs only against the Secretary and not the Board. The plaintiffs have asked the Court to compel the Secretary "to issue guidance to South Dakota's county auditors instructing them to provide all voters with adequate and meaningful notice and an opportunity to cure before registering them as federal-only voters because of failure to provide documentary proof of citizenship or errors with such documentation." (Doc. 10, at 1-2.) Under South Dakota law, the Secretary does not have authority to promulgate substantive rules governing voter registration or

the contents of notices that accompany unsuccessful registration attempts. *See* SDCL § 12-4-39 (giving the Secretary the authority to promulgate rules, but only concerning retention and transmission of voter-registration records). The responsibility for sending out notices to affected voters lies again with county auditors, *id.* § 12-4-2; *id.* § 12-4-5.3; and the Board, not the Secretary, is tasked with issuing guidance and rules governing the contents of notices sent to registrants. *Id.* § 12-4-5.3; *id.* § 12-1-9. While the Secretary can issue nonbinding guidance to county auditors, the auditors are free to discard that guidance and proceed how they see fit.

## IV. Even supposing that either the League or Hill had standing to sue, this Court cannot fashion a universal remedy that runs beyond the two plaintiffs or that compels state officials to promulgate new guidance or rules governing local elections.

For the reasons set forth above, the relief that the League and Hill have requested runs against the wrong defendants, neither of whom can be compelled to remedy the claimed harm. But that is not the only defect with the proposed injunction. Instead, there are two additional reasons that the Court should decline to enter the relief requested. ***First***, by its terms, the relief would run beyond the plaintiffs and in favor of "all voters" who might otherwise be registered "as federal-only voters on the basis of a lack of documentary proof of citizenship." (Doc. 10, at 1.) That is improper. The Supreme Court has cautioned that granting injunctive relief that reaches beyond "the plaintiffs in the lawsuit" and to "anyone" "likely exceed[s] the equitable authority that Congress has granted to federal courts." *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). Instead, a court may grant injunctive relief only to the parties "actually or constructively before it" and only to the extent "necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 844, 861 (quoting *Gregory v. Stetson*, 133 U.S. 579, 586 (1890)).

True, *CASA* involved a nationwide injunction, not a statewide one. But the animating principle is the same for universal injunctions that purport to encompass all affected persons in a

single state: "[T]here is no statewide-injunction exception to *CASA*. *CASA*'s holding—that universal injunctions exceed a district court's authority—applies equally to statewide injunctions." *HM Fla.-ORL, LLC v. Governor of Fla.*, No. 23-12160, 2026 WL 2235960, at *4 (11th Cir. Aug. 4, 2026); *see CASA*, 606 U.S. at 843 (citing with approval *Scott v. Donald*, 165 U.S. 107, 109, 117 (1897), which limited what was a more sweeping injunction against a state law to the party "named as plaintiff . . . in the bill"). Here, the requested relief reaches well beyond the plaintiffs. Even if those plaintiffs had standing to seek injunctive relief against the Secretary or Board—and they do not—any notice-based relief this Court might fashion must be limited to the League and Hill. It has no authority to impose relief for the benefit of "all voters."

***Second***, the plaintiffs' second requested injunction—which seeks to compel the Secretary to issue new guidance about how to implement S.B. 175—exceeds the equitable authority of this Court. As an initial matter, this proposed injunction is mandatory, not prohibitory. Mandatory injunctions directing a party to take some step beyond maintaining the status quo are "particularly disfavored" and "sparingly issued." *Breckheimer v. Jacobsen*, No. 23-00188, 2024 WL 1996157, at *2 & n.1 (D.N.D. Apr. 29, 2024) (internal quotations omitted). These concerns are heightened further still when the object of the proposed injunction is a state official. Whenever a party proposes injunctive relief "against a state or local government or governmental entity, concerns of federalism counsel respect for the 'integrity and function' of those bodies." *Signature Props. Int'l Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1269 (10th Cir. 2002) (quoting *Knox v. Salinas*, 193 F.3d 123, 129-30 (2d Cir. 1999)). It is "especially appropriate" for a federal court to tread lightly in cases in which "the type of injunction sought [against a state official] is mandatory rather than prohibitory." *Id.*; *see also Lewis v. Casey*, 518 U.S. 343, 349-50 (1996) (cautioning against attempts to "manage" a state's public institutions via injunction).

Here, the proposed injunctive relief extends well beyond the outer limits of what is appropriate for a federal court. In essence, the plaintiffs have asked this Court to force an elected state official to promulgate new rules or guidance for local elections. State and local election law "is for the most part a preserve that lies within the exclusive competence of the state courts." *Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524 F.3d 892, 898 (8th Cir. 2008) (internal quotation omitted). For that reason, "federal courts have no authority to dictate to the [s]tates precisely how they should conduct their elections." *Esshaki v. Whitmer*, 813 F. App'x 170, 172 (6th Cir. 2020); *see also Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir. 2020) ("Federal courts can enter positive injunctions that require parties to comply with existing [election] law. But they cannot usurp[] a [s]tate's legislative authority by re-writing its statutes to create new law.") (second alteration in the original) (internal quotation omitted). By entering an injunction that affirmatively commands a state actor to promulgate new rules for local elections, this Court would overstep its role within the federal system and raise serious commandeering concerns. Even if the plaintiffs had standing, the Court should decline to impose such relief.

## CONCLUSION

Preliminary injunctive relief is unwarranted in this case. Neither the League nor Hill has standing to challenge the alleged lack of notice and opportunity to cure, and, without standing, they cannot "clearly show" that they are likely to prevail on the merits of their due-process claim. *Bird*, 157 F.4th at 917-18; *Rodgers*, 942 F.3d at 455-56. Even if one of the plaintiffs did have standing, the requested injunctive relief extends far beyond the equitable powers of this Court. For both reasons, the plaintiffs' motion for preliminary injunction should be denied.

Dated this 4th day of September, 2026.

WOODS, FULLER, SHULTZ & SMITH P.C.

By /s/ Drew A. Driesen
James E. Moore
Drew A. Driesen
PO Box 5027
300 South Phillips Avenue, Suite 300
Sioux Falls, SD 57117-5027
Phone (605) 336-3890
Fax (605) 339-3357
Email james.moore@woodsfuller.com
Email drew.driesen@woodsfuller.com
*Attorneys for Defendants*